## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| STEPHANIE WHITE | : | |
| | : | CIVIL ACTION NO. |
| Plaintiff | : | |
| | : | |
| vs. | : | |
| | : | |
| | : | JURY TRIAL DEMAND |
| ULTA SALON, COSMETICS & | : | |
| FRAGRANCE, INC. | : | |
| | : | |
| Defendant. | : | November 14, 2023 |

## COMPLAINT

### Introduction

1.      This case concerns the repeated refusal of the Defendant, ULTA Salon, Cosmetics & Fragrance, Inc. ("Defendant" or "ULTA") to accommodate the disability of the Plaintiff, Stephanie White ("Plaintiff") following her diagnosis with COVID-19.  Shortly after being diagnosed with COVID-19 in December 2021, Plaintiff began experiencing lasting effects of the infection, now known as "Long COVID."  Plaintiff consistently informed her General Manager, Elizabeth Inturrisi ("Ms. Inturrisi") about her continuing symptoms and concerns, as well as her doctors' inability to diagnose the problem.  Ms. Inturrisi, of her own accord, determined that Plaintiff's ongoing medical issues were simply "anxiety" and discounted Plaintiff's concerns at every turn.  ULTA and its managers penalized Plaintiff through their attendance point system for experiencing legitimate medical emergencies at work, despite Plaintiff's repeated requests for accommodations to deal with the effects she was experiencing of Long COVID.

2.      Even if Plaintiff's disability was "anxiety," as Ms. Inturrisi unilaterally determined, ULTA still would have been required to engage in the interactive process to determine if it could

make reasonable accommodations so that Plaintiff could perform the essential functions of her role.  However, it is clear that Plaintiff was <u>not</u> experiencing solely anxiety, as her Long COVID has now been properly diagnosed as multiple sclerosis ("MS") triggered by her initial COVID infection.

3.      Ultimately, Defendant forced Plaintiff out of her employment by failing to provide any reasonable accommodations for her disability, placing her on a modified point system inapplicable to any other employees that set her up for failure, and eventually constructively discharging her employment.

4.      Defendant's sole basis for its treatment of Plaintiff is that she "exhibited unusual and unprofessional behaviors at work" and had "attendance problems."  Defendant's actions were clearly pretextual, Plaintiff was never subjected to any disciplinary action due to "unusual and unprofessional behavior" or otherwise, other than receiving a single documented coaching regarding her punches in February 2022, and Defendant did not document one instance of unprofessional behavior in her personnel file.

## **PARTIES**

5.      Plaintiff is an individual residing in Bethany, Connecticut.

6.      Plaintiff suffers from Post-COVID Conditions, also referred to as "Long COVID," which includes a wide range of new, returning, or ongoing health problems experienced after first being infected with the virus that causes COVID-19.  Plaintiff developed Long COVID after contracting the COVID-19 virus in December 2021.

7.      Plaintiff also suffers from multiple sclerosis triggered by COVID, which is a chronic autoimmune disorder affecting the central nervous system.

8.      Defendant ULTA Salon Cosmetics & Fragrance, Inc. is a Delaware corporation with its national headquarters in Bolingbrook, Illinois.

9.      ULTA operates retail stores that sell cosmetics and other beauty products throughout the country, including Connecticut.  Upon information and belief, ULTA employs approximately 35,000 employees nationwide.

10.     At all times relevant to this Complaint, ULTA operated a store at 100 Main Street North, Southbury, Connecticut 06488 (the "Southbury Store").

## JURISDICTION & VENUE

11.     This Court has jurisdiction pursuant to both 28 U.S.C. §§ 1331 and 1332(a)(2) as: (1) Plaintiff asserts a claim under federal law; and (2) there is complete diversity of citizenship and the amount in controversy is in excess of $75,000.00, exclusive of interest and costs.

12.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367, as Plaintiff's federal cause of action arises out of the same facts and circumstances as does the state causes of action.

13.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this claim occurred in the State of Connecticut.

## FACTS

14.     On or about July 17, 2020, Plaintiff was hired by ULTA to work as a Prestige Beauty Advisor on a part-time basis at the Southbury Store at an hourly rate of $15.00 per hour.

15.     On August 4, 2020, Plaintiff began her employment at the Southbury Store as a Prestige Beauty Advisor.

16.     During her tenure at ULTA, Plaintiff reported to the General Manager, Elizabeth Inturrisi.

17.     During her tenure at ULTA, Plaintiff was supervised in a sales capacity by the Services Manager, Melissa D'Antonio ("Ms. D'Antonio").   Upon information and belief, Ms. D'Antonio reported to Ms. Inturrisi.

18.     During her tenure as a Prestige Beauty Advisor, Plaintiff's schedule varied from week-to-week and she typically worked five days a week for 20-30 hours per week.

19.     On or about July 24, 2021, Plaintiff received her annual performance review for the time period of August 4, 2020 to January 31, 2021.  In her performance review, ULTA indicated that Plaintiff met or exceeded all expectations. Specifically, the review provided that:

  a.  Plaintiff demonstrated "a strong sense of personal ownership of work by setting high expectations, taking initiative, and instilling accountability for meeting or exceeding goals."

  b.  Plaintiff was "self-motivated" and took "initiative without waiting for direction from others, while not afraid to ask for help when needed."

  c.  Plaintiff provided "excellent service experience for the guest or internal partner, going above and beyond with each interaction."

  d.  Plaintiff led "by example with a focus on performance improvement and career development by acting on feedback, upholding ULTA Beauty's values, and leveraging the strengths of others and tries to learn from them to change behavior for the better."

20.     In her 2020 annual performance review, Ms. D'Antonio provided Plaintiff with complimentary feedback.

21.     Plaintiff also won sales contests at ULTA and was awarded Employee of the Month on one occasion.  Upon information and belief, the Employee of the Month award is an award that Defendant does not routinely award employees.

22.     As a result of her exemplary performance, in or about November 2021, Plaintiff was promoted to the position of "Specialty Beauty Advisor" for Chanel brands.   Plaintiff's promotion was accompanied by a raise to $21.00 per hour.

23.    In her role as the Specialty Beauty Advisor for Chanel brands, Plaintiff's schedule varied from week-to-week, but she typically worked five days a week for 30-40 hours per week, which is considered "full-time" at ULTA.

24.    ULTA has a point system to account for absences from work, the Attendance and Recording of Time ("Punch") Policy.  The system consists of 8-points.  Each late arrival or early departure deducts 0.5 points; each full-day absence deducts 1.0 points.  Once an employee reaches 8.0 points, they may be fired.

### *Plaintiff's Initial COVID-19 Infection and Long-COVID Symptoms*

25.    On or about December 17, 2021, Plaintiff was diagnosed with COVID-19.  Plaintiff promptly notified her manager, Ms. Inturrisi, who in turn notified the necessary parties.  Plaintiff complied with ULTA's COVID-19 ten-day isolation policy in accordance with the CDC Guidelines at that time.  At the end of her isolation period, Plaintiff returned to her employment at ULTA.

26.    Prior to her COVID-19 diagnosis, Plaintiff had never taken a leave of absence and had always met or exceeded expectations and received positive performance evaluations.

27.    In accordance with ULTA's COVID-19 protocols, Plaintiff isolated herself from others beginning on or about December 17, 2021.  Shortly after the end of her quarantine, after her primary COVID symptoms subsided, Plaintiff began developing physical and mental symptoms of "Long COVID." These symptoms included: distorted sense of smell, sneezing, numbness in her throat, sore throat, difficulty breathing, ear ringing, dizziness and vertigo, sinus infections, nerve pain, numbness and tingling in her extremities, fainting, muscle spasms, bradycardia, tachycardia, heart palpitations, chest pain, migraines, blood clotting risks, neck and back pain, muscle pain,

difficulty urinating due to numbness, GERD, blurred vision, eye pressure, jaw pain, jaw pressure, brain fog, and rashes.

28.    On or about December 28, 2021, Plaintiff notified Ms. Inturrisi via text message of her continuing symptoms and concerns.  On the same date, Plaintiff requested that she be allowed to speak to District Manager Dawn LaMothe or a corporate Human Resources representative about her Long COVID symptoms and her ability to work in order to make them aware of her situation and discuss accommodations.

29.    Ms. Inturrisi discouraged Plaintiff from reaching out to upper management on her own and did not connect Plaintiff with the appropriate contact despite her request.

30.    Despite knowing of Plaintiff's symptoms, Ms. Inturrisi dismissed Plaintiff's symptoms as "anxiety" and said that she would "keep it quiet" because "ULTA doesn't care about anxiety."  Ms. Inturrisi stated that anxiety was not an acceptable excuse to request an accommodation at ULTA.

31.    Plaintiff followed the instructions of her General Manager, Ms. Inturrisi, at that time and did not attempt to reach out to upper management or Human Resources on her own, for fear that she would be seen as insubordinate by Ms. Inturrisi.

32.    Pursuant to the ULTA Beauty Code of Business Conduct (the "Code"), concerns should first be shared with a manager, as the Code states "[o]ften, he or she will be able to offer guidance and answer any questions you may have."  The Code further states that "[m]anagers have an even greater responsibility and are held to a higher standard."

33.    Since December 28, 2021, Plaintiff's medical complications have affected her day-to-day life and her ability to work.  On various occasions from late December 2021 through the end of April 2022, Plaintiff experienced "flare ups" while at work; such episodes included

symptoms such as an elevated heart rate, palpitations, chest pain, and difficulty breathing, among others.

34.    Plaintiff's symptoms required visits to numerous specialists, including but not limited to: a neurologist, cardiologist, gastrologist, orthopedist, ophthalmologist, gynecologist, psychotherapist, and an ear, nose, and throat specialist (collectively, the "Specialists").

35.    Plaintiff's Specialists consistently informed her in the spring of 2022 that her symptoms were related to a viral infection, most likely related to her COVID-19 infection in December 2021.  ULTA was aware of Plaintiff's visits to the various Specialists and the results thereof.

36.    Plaintiff attempted to schedule doctors' appointments, including with the Specialists, on her days off from ULTA, but was not always able to do so.

### *Plaintiff Attempted to Request Accommodations for Her Disability from Her Managers*

37.    Plaintiff attempted on numerous occasions to speak with Ms. Inturrisi and Ms. D'Antonio about submitting paperwork from the Specialists to document and verify her symptoms and medical limitations. Each time, Ms. Inturrisi indicated that she could not accept medical paperwork from the Specialists.

38.    Plaintiff asked Ms. Inturrisi for time off or to discuss accommodations due to the likelihood that she would experience symptoms of Long COVID at work.  Specifically, Plaintiff asked for the following modest accommodations:

a.    The opportunity to sit in the breakroom if/when her symptoms flared up;

b.    The ability to step outside for fresh air if/when her symptoms flared up; and

c.    To schedule her shifts to start later in the day and end earlier in the evening, as her symptoms were the worst in the morning and at night.

39.     Each time Plaintiff requested accommodations at work, ULTA and its representatives denied her requests and failed to engage in the interactive process with her.  In fact, ULTA and its representatives even would attempt to verify Plaintiff's symptoms themselves, as Ms. Inturrisi would closely examine Plaintiff or physically put her hand on Plaintiff's chest to see if she could feel her heart racing.

40.     On each occasion that Plaintiff requested accommodations at work, Ms. Inturrisi refused to review Plaintiff's doctors' notes and dismissed her symptoms as "anxiety."  Plaintiff explicitly told Ms. Inturrisi that her doctors were unable to formally diagnose her, but many suggested she was experiencing Long COVID, rather than anxiety.

41.     As a result of the consistent denials of her requests for accommodation and disregard of her symptoms as "anxiety," Plaintiff began to become fearful of reprisal.  Contrary to the message in the Code emphasizing ULTA's "culture in which associates feel safe to speak up," Plaintiff's concerns and requests for accommodation were dismissed.  Thus, Plaintiff did not feel confident in herself and her symptoms to call corporate Human Resources to ask for an accommodation directly.

42.     Because of her Long COVID symptoms, Plaintiff often experienced dizziness or blurriness when driving to work.  To better protect her own and the public's safety, Plaintiff would stop driving during these flare ups, and would resume driving when her symptoms subsided.  As a result, Plaintiff was occasionally late to work, resulting in "points" being awarded to her.

43.     On each of these instances, Plaintiff informed her manager, either Ms. Inturrisi or Ms. D'Antonio, that the reason for her tardiness was related to her medical symptoms.

44.     Plaintiff requested from Ms. Inturrisi on multiple occasions ULTA's policies regarding taking a leave of absence and the Family and Medical Leave Act (FMLA), as well as policies to support Ms. Inturrisi's statements that doctors' notes were not accepted at ULTA.

45.     Plaintiff attempted to access the policies herself, but her understanding was that the policies were only available on ULTA computers at ULTA locations.  Plaintiff did not want Ms. Inturrisi to see her searching for the policies and appear defiant, nor did she want to take time away from performing her job responsibilities on the sales floor in order to search for the policies.

### *ULTA Unilaterally Determined Plaintiff Was Experiencing "Anxiety" and Dismissed Her Legitimate Medical Issues*

46.     Ms. Inturrisi further disregarded Plaintiff's symptoms as anxiety, and stated that anxiety was not an acceptable reason to request leave under the FMLA.

47.     On January 5, 2022, in response to a text documenting Plaintiff's Chanel sales, Ms. Inturrisi stated she was "glad [her] mental health [was] getting better."

48.     On February 2, 2022, Ms. Inturrisi texted Plaintiff's mother, Lynette White, telling her mother that "if she can't pull it together just take her home" and that she "tried calling her" and that Plaintiff was "hysterical."

49.     Lynette White does not have a personal relationship with Ms. Inturrisi.  Plaintiff only granted Ms. Inturrisi permission to message or call her mother in emergency situations in her capacity as her emergency contact.

50.     On February 22, 2022, Ms. Inturrisi entered "documented coaching" to address Plaintiff's attendance points, nearly all of which were after her COVID-19 diagnosis on or around December 17, 2021.

51.     On March 19, 2022, Ms. Inturrisi texted Plaintiff's mother again stating "just had her clock out she's a mess can't have her here . . . she's just not stable enough to work."

52.     On March 20, 2022, Ms. Inturrisi texted Plaintiff screenshots of an accommodation policy, which Plaintiff had previously requested on multiple occasions.  Ms. Inturrisi failed or refused to provide Plaintiff with physical copies of this paperwork.

53.     Ms. Inturrisi later denied such accommodation policy existed when Plaintiff raised the issue again.

54.     Instead, Ms. Inturrisi said that ULTA does not provide accommodations and that Plaintiff's options were to continue to work as-is, take a full leave of absence, or quit.

55.     On March 30, 2022, Plaintiff again requested via text message that Ms. Inturrisi connect her with the District Manager, Dawn LaMothe.  Instead of giving Plaintiff her contact information so that Plaintiff could contact her directly, Ms. Inturrisi informed Plaintiff that District Manager Dawn LaMothe would meet with Plaintiff on April 6, 2022 at the ULTA store.  However, neither Ms. Inturrisi nor District Manager Ms. LaMothe showed up to the meeting.

56.     On April 17, 2022, following Plaintiff's 2021 annual performance and merit review, Plaintiff received a merit increase in her salary, from $21.00 to $22.26, in a letter from the ULTA CEO David Kimbell thanking Plaintiff for her contributions to ULTA.

57.     On or around April 20, 2022, Plaintiff received her 2021 annual performance review which again documented that, from February 1, 2021 to January 31, 2022, Plaintiff met or exceeded expectations.  Neither Ms. Inturrisi nor Ms. D'Antonio left individual comments on Plaintiff's 2021 annual performance review.

### *Nearly Three Months After Plaintiff Notified Her Managers of Her Need for Accommodations, Plaintiff Reached Out to Corporate HR Herself*

58.     On or around March 14, 2022, Plaintiff called ULTA Human Resources and specifically requested FMLA paperwork.  Despite Plaintiff's repeated requests over the course of nearly three months and notification to Ms. Inturrisi and Ms. D'Antonio of her Long COVID

symptoms and need for leave, neither Ms. Inturrisi nor Ms. D'Antonio ever provided Plaintiff with any paperwork or assistance in the process.

59.     On April 14, 2022, a full month after Plaintiff reached out to Human Resources herself, ULTA's FMLA representative, ReedGroup, emailed Plaintiff FMLA paperwork.

60.     On April 26, 2022, Plaintiff received an automated reminder requesting submission of FMLA medical documentation within 7 days of the date of the notice, by May 3, 2022.

61.     On April 28, 2022, Plaintiff experienced a dangerously elevated heart rate and severe chest pain at work.  Plaintiff clocked out and exited the Southbury Store in order to measure her pulse-oxygen rate outside on the sidewalk, away from customers.  Because she wears acrylic nails, Plaintiff was aware that the measurement does not always read on her finger, so she removed her shoe to measure her pulse-oxygen rate on her toe instead.  Ms. Inturrisi later characterized this conduct to Plaintiff's mother as Plaintiff "stripping in the parking lot."  As a result of this medical emergency, 911 was called, but Plaintiff did not require an emergency room visit on this date.

62.     The following day, on April 29, 2022, Plaintiff experienced blurred vision and an elevated heart rate on her way into work.  Plaintiff pulled into the Oxford Police Department and expressed that she did not feel well and could not safely make it to work.  The Oxford PD called an ambulance and Plaintiff was taken to Griffin Hospital.  After evaluation, Plaintiff was provided with a work release, stating that she could not return to work until May 2, 2022.

63.     Plaintiff attempted to submit the Emergency Department paperwork to Ms. Inturrisi to demonstrate her inability to work her scheduled shifts through May 2, 2022.  Ms. Inturrisi refused to accept the documentation from Griffin Hospital to excuse her absences.  Plaintiff also texted the documentation to Ms. D'Antonio.

64.    On April 29, 2022, following Plaintiff's medical emergency, Ms. Inturrisi called Plaintiff's mother, Lynette White, to report that Plaintiff would be terminated and that they were calling Plaintiff's mother because of Plaintiff's issues with anxiety.  Plaintiff did not sign a release permitting ULTA to share her personnel or employment information with anyone, including her mother.

65.    Despite Ms. Inturrisi's statement to Plaintiff's mother that her employment would be terminated, Plaintiff never received a termination notice.

66.    On May 3, 2022 at 12:52 a.m., the final day to submit the requested FMLA paperwork and the day Plaintiff had scheduled with her doctors to complete the paperwork, Plaintiff received an automated decision notice denying her leave request as follows:

| Plans | Status | From | Through | Leave Type | Reason |
|-------|--------|------|---------|------------|--------|
| Connecticut Family Medical Leave | Denied | 03/14/2022 | 09/14/2022 | Intermittent Leave | Certification Not Returned |
| Connecticut Paid Leave - State Tracking | Denied | 03/14/2022 | 09/14/2022 | Intermittent Leave | Certification Not Returned |
| Family Medical Leave Act | Denied | 03/14/2022 | 09/14/2022 | Intermittent Leave | Certification Not Returned |

67.    ULTA interfered with Plaintiff's FMLA rights by prematurely denying her application and not accepting paperwork to validate her claim.

68.    Since Ms. Inturrisi would not accept her medical documentation, Plaintiff had to schedule doctor's appointments on her days off or at times when she was not scheduled for a shift. This hampered Plaintiff's ability to schedule an appointment with an appropriate physician to complete the necessary FMLA paperwork.

### *ULTA Constructively Discharged Plaintiff*

69.     On or about May 3, 2022, four days after Ms. Inturrisi informed Plaintiff's mother that Plaintiff's employment would be terminated by ULTA, Ms. Inturrisi called to inform Plaintiff that she, in fact, had not been terminated.  Rather, Ms. Inturrisi stated that District Manager Dawn LaMothe requested that Plaintiff resign from ULTA or, if Plaintiff would not resign, she would be placed on a modified point system effective immediately.

70.     Under the modified point system, Plaintiff would receive no scheduling accommodations for medical visits or otherwise.  If she was scheduled to work on a certain day, she was required to show up on time or would be penalized in the point system and terminated.

71.     Under the modified point system, Plaintiff would be penalized 1.0 points for a doctor's appointment previously scheduled for that week, of which she had previously called four times to notify ULTA.  Plaintiff was also informed that she would be penalized if she experienced a medical emergency at work that caused her to miss any portion of a shift.

72.     Plaintiff requested that the purported modified point system be provided to her in writing, but such documentation was never provided.

73.     Upon information and belief, Plaintiff was the only ULTA employee at the Southbury location to have been placed on such modified point system. Additionally, Plaintiff was treated differently than other employees when points were awarded.

74.     Plaintiff was retaliated against for attempting to file an FMLA request and requesting accommodations.

75.     With her employment status in limbo, Plaintiff felt she had no choice but to end her employment.  On May 7, 2022, Plaintiff was forced to resign from her position as Specialty Beauty Advisor because the work environment was intolerable due to ULTA's failure to accommodate

her disability.  ULTA created an intolerable work environment because of its refusal to accommodate or even consider accommodating her disability, and setting up a point system that would inevitably lead to her termination as punishment for missing a shift due to an unavoidable medical emergency.

76.    ULTA and its employees repeatedly impeded Plaintiff's ability to raise her concerns about accommodations and time off to ULTA corporate HR or her District Manager Dawn LaMothe.  ULTA did not take her medical emergencies or disability seriously, violated her privacy by communicating with her mother about her employment, and retaliated against her for requesting FMLA and accommodations by placing her on a modified point system.

77.    Defendant constructively terminated Plaintiff's employment on the basis of her disability.  Specifically, Defendant failed and refused to provide reasonable accommodation for her disability, failed to engage in the interactive process with her, and intentionally made the work atmosphere so intolerable that Plaintiff felt compelled to resign.

78.    Even after her constructive discharge, ULTA continued to retaliate against Plaintiff. Plaintiff timely elected to maintain her insurance coverage through COBRA provided by ULTA on June 15, 2022, and paid in full for the period of May 8, 2022 through June 30, 2022.

79.    On or about June 22, 2022, BlueCross BlueShield informed Plaintiff that her benefits would activate within two to three business days.

80.    On June 23, 2022, Plaintiff was formally diagnosed with Long COVID.

81.    When Plaintiff called BlueCross BlueShield in late June 2022 regarding her health insurance coverage not yet being activated, Plaintiff was informed that ULTA had not yet authorized the activation of her benefits.  As a result, Plaintiff had difficulty scheduling her necessary medical appointments, despite paying for full coverage.

82.     On December 12, 2022, Plaintiff's neurologist in consultation with Plaintiff's MS specialist, diagnosed her with Multiple Sclerosis (MS) triggered by Long COVID.  Since that date Plaintiff has been receiving regular medical treatment to control and manage the disease.

83.     MS is a permanent disability of the central nervous system that manifests itself in a range of mental and physical symptoms.  In particular, Plaintiff suffers from exhaustion, pain, memory loss, stiffness and/or shaking in the morning.  Plaintiff also occasionally suffers a "flare up" of the disease, which generally manifests itself in the form of painful migraines and/or muscle spasms in her neck and back, tremors, numbness and tingling that limit her mobility and/or vision.

84.     However, with reasonable accommodation, Plaintiff is able to completely perform the job responsibilities required of a Specialty Beauty Advisor.

85.     Plaintiff is now, after proper medical diagnosis and treatment, able to better manage and control her symptoms.  Plaintiff is now aware that stress is a major factor in triggering an MS flare.  ULTA's failure to consider or provide reasonable accommodations and punitive decisions towards Plaintiff created substantial stress while employed, which triggered MS flare ups.

86.     As a result of ULTA's continuous course of discriminatory conduct, retaliation, and her constructive discharge, Plaintiff has suffered aggravation of her disability, stress, anxiety, lack of appetite, financial strain, depression, and sleeplessness.

87.     Plaintiff's Specialists have indicated that had ULTA taken her requests seriously, rather than consistently mischaracterizing them as simply "anxiety," the severity of her Long COVID may have been mitigated or prevented.  Had ULTA taken Plaintiff's medical condition and disability seriously, Plaintiff could have continued her employment with ULTA and avoided the thousands of dollars she has incurred in medical costs.

### *The CHRO Investigation*

88.    On or about February 17, 2023, and within 300 days after the alleged unlawful employment practices detailed in this Complaint, Plaintiff filed a complaint against Defendant with the Connecticut Commission on Human Rights and Opportunities ("CHRO") asserting that she was discriminated against on the basis of her disability, was denied reasonable accommodation of her disability, and was constructively discharged based on her disability.

89.    The filing of this complaint constituted a joint filing with the Equal Employment Opportunity Commission ("EEOC").

90.    The CHRO performed a Case Assessment Review and retained Plaintiff's complaint for further processing.

91.    By letter dated August 16, 2023, Plaintiff requested that she be permitted to commence this litigation.

92.    The CHRO issued a Release of Jurisdiction on August 17, 2023, a date less than 90 days prior to the filing of this Complaint. Similarly, on August 31, 2023, the EEOC mailed Plaintiff a Notice of Right to Sue form.

### COUNT ONE - VIOLATION OF THE AMERICANS WITH DISABILITIES ACT (42 U.S.C. § 12101 *et seq.*) – FAILURE TO ACCOMMODATE

93.    Plaintiff repeats and realleges paragraphs 1 through 92 of the Complaint as if fully set forth herein.

94.    Plaintiff's Long COVID, now properly diagnosed as MS, is a physical and mental impairment that substantially limits one or more of Plaintiff's major life activities.

95.    Defendant subjected Plaintiff to actions prohibited under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, by reason of actual or perceived physical impairment of Plaintiff by Long COVID.

96.     By refusing to provide reasonable accommodation for Plaintiff's disability, Defendant violated the ADA.

97.     By discriminating against Plaintiff on the basis of her disability in the terms and conditions of employment, including the imposition of a modified point system, Defendant violated the ADA.

98.     Defendant violated the ADA by constructively discharging Plaintiff on the basis of her disability and/or an unwillingness to provide reasonable accommodation for her disability.

99.     As a result of Defendant's discriminatory practices, Plaintiff has been deprived of all the benefits and privileges of employment in an amount to be established at trial, and has suffered aggravation of her disability.  Plaintiff therefore is entitled to such affirmative relief as may be appropriate under the ADA.

100.    Defendant's acts and/or omissions were intentional, without cause, and were calculated deliberately and with malice or with reckless indifference to Plaintiff's federally protected rights so as to entitle Plaintiff to an award of punitive damages.

**<u>COUNT TWO</u> – TITLE VII, CIVIL RIGHTS ACT OF 1964 (42 U.S.C. 2000e et seq.) - DISCRIMINATION**

101.    Plaintiff repeats and realleges paragraphs 1 through 92 of the Complaint as if fully set forth herein.

102.    Plaintiff is a member of a protected class based on her disability.

103.    Plaintiff was qualified and was in fact performing the duties asked of her by Defendant, including, but not limited to, the duties of a Specialty Beauty Advisor for Chanel brands.

104.    Defendant's sole basis for their refusal to provide accommodations for Plaintiff was that Plaintiff purportedly did not submit supporting FMLA documentation.  This is clearly pretextual given the various requests for accommodation that Plaintiff made in the months leading up to the premature denial of her request for FMLA leave, all of which were disregarded or ignored by Defendant in its refusal to engage in the interactive process.

105.    Defendant discriminated against Plaintiff with respect to the terms, conditions and privileges of employment in violation of the Civil Rights Act of 1964, 42 U.S.C. 2000e-2 ("Title VII") by refusing to accommodate Plaintiff's disability.

106.    Defendant discriminated against Plaintiff with respect to the terms, conditions and privileges of employment in violation of Title VII by constructively terminating Plaintiff on the basis of her disability.

107.    By reason of the foregoing, Defendant deprived Plaintiff of certain benefits, privileges, terms and conditions of employment because of her disability, all to her damage and injury.

108.    As a result of Defendant's discriminatory practices, Plaintiff has been deprived of all the benefits and privileges of employment in an amount to be established at trial.  Plaintiff is therefore entitled to such affirmative relief as may be appropriate under Title VII.

109.    Defendant's acts and/or omissions were intentional, without cause, and were calculated deliberately and with malice or with reckless indifference to Plaintiff's federally protected rights so as to entitle Plaintiff to an award of punitive damages.

**COUNT THREE** – **CONNECTICUT FAIR EMPLOYMENT PRACTICES ACT (Conn. Gen. Stat. § 46a-60** *et seq.***)** – **DISCRIMINATION**

110.     Plaintiff repeats and realleges paragraphs 1 through 92 of the Complaint, as if fully set forth herein.

111.     By discriminating against Plaintiff on the basis of her disability, Defendant has engaged in a discriminatory practice in violation of the Connecticut Fair Employment Practices Act ("CFEPA"), specifically Conn. Gen. Stat. § 46a-60(a)(1).

112.     As a result of Defendant's discriminatory practices, Plaintiff has been deprived of all the benefits and privileges of employment in an amount to be established at trial.  Plaintiff therefore is entitled to such affirmative relief as may be appropriate under CFEPA.

113.     Defendant's violation of CFEPA was intentional or committed with reckless indifference to Plaintiff's rights so as to entitle Plaintiff to an award of punitive damages.

**COUNT FOUR** – **THE FAMILY AND MEDICAL LEAVE ACT (29 U.S.C. § 2601** *et seq.***)** - **INTERFERENCE**

114.     Plaintiff repeats and realleges paragraphs 1 through 92 of the Complaint as if fully set forth herein.

115.     Plaintiff was an eligible employee under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*

116.     Defendant is an employer covered by the FMLA.

117.     Plaintiff was entitled to take leave under the FMLA.

118.     Plaintiff gave notice to the Defendant of her intention to take leave.  Specifically, Plaintiff asked her General Manager on numerous occasions to connect her with the appropriate person to discuss her FMLA rights, such as a leave of absence or intermittent leave for doctors' appointments. Despite these requests and Plaintiff's professed intention to exercise her rights under

the applicable family leave statutes, the General Manager never connected Plaintiff with Human Resources or the District Manager in order to begin the process.

119.    In fact, Ms. Inturrisi actively discouraged Plaintiff from applying for FMLA leave, stating that anxiety was not an acceptable reason to take FMLA leave, and that ULTA did not care about anxiety. On numerous occasions in the spring of 2022, Defendant impeded Plaintiff's exercise of her FMLA rights.

120.    When Plaintiff finally reached out to Human Resources to request FMLA paperwork on her own, she did not receive such paperwork until a month later.

121.    Once Plaintiff had initiated the FMLA process, she worked to arrange appointments with her Specialists in order to fill out the necessary paperwork requested by ULTA.  She was given a deadline of May 3, 2022 to complete the paperwork.

122.    However, in the early morning of May 3, 2022 at 12:52 a.m., the day on which Plaintiff had scheduled to meet with her Specialists and complete the paperwork, ULTA prematurely denied her FMLA claims.

123.    As Defendant improperly denied Plaintiff's request for FMLA leave and discouraged her from taking FMLA leave, Plaintiff was denied benefits to which she was entitled under the FMLA.

124.    As a result of Defendant's interference with Plaintiff's exercise of her FMLA rights, Plaintiff has suffered damages in an amount to be established at trial.  Plaintiff therefore is entitled to such affirmative relief as may be appropriate under the FMLA.

125.    Defendant's violation of the FMLA was intentional, done in bad faith, or committed with reckless indifference to Plaintiff's rights so as to entitle Plaintiff to an award of liquidated damages under the FMLA.

**COUNT FIVE** – **CONNECTICUT FAMILY MEDICAL LEAVE ACT (Conn. Gen. Stat. §§ 31-51kk through 31-51qq) – INTERFERENCE**

126.    Plaintiff repeats and realleges paragraphs 1 through 92 of the Complaint as if fully set forth herein.

127.    Plaintiff was an employee eligible for leave under the Connecticut Family Medical Leave Act ("CTFMLA"), Conn. Gen. Stat. §§ 31-51kk through 31-51qq, inclusive.

128.    Plaintiff suffers from a serious health condition, as defined by the CTFMLA.

129.    Defendant is a covered employer under the CTFMLA.

130.    Plaintiff gave notice to the Defendant of her intention to take leave.  Specifically, Plaintiff asked her General Manager on numerous occasions to connect her with the appropriate person to discuss her CTFMLA rights, such as a leave of absence or intermittent leave for doctors' appointments. Despite these requests and Plaintiff's professed intention to exercise her rights under the applicable family leave statutes, Ms. Inturrisi never connected Plaintiff with Human Resources or the District Manager in order to begin the process.

131.    In fact, Ms. Inturrisi actively discouraged Plaintiff from applying for CTFMLA leave, stating that anxiety was not an acceptable reason to take CTFMLA leave, and that ULTA did not care about anxiety. On numerous occasions in the spring of 2022, Defendant impeded Plaintiff's exercise of her CTFMLA rights.

132.    When Plaintiff finally reached out to Human Resources to request CTFMLA paperwork on her own, she did not receive such paperwork until a month later.

133.    Once Plaintiff had initiated the CTFMLA process, she worked to arrange appointments with her Specialists in order to fill out the necessary paperwork requested by ULTA. She was given a deadline of May 3, 2022 to complete the paperwork.

134.    However, in the early morning of May 3, 2022 at 12:52 a.m., the day on which Plaintiff had scheduled to meet with her Specialists and complete the paperwork, ULTA prematurely denied her CTFMLA claims.

135.    As Defendant improperly denied Plaintiff's request for FMLA leave and discouraged her from taking CTFMLA leave, Plaintiff was denied benefits to which she was entitled under the CTFMLA.

136.    As a result of Defendant's interference with Plaintiff's exercise of her CTFMLA rights, Plaintiff has suffered damages in an amount to be established at trial.  Plaintiff therefore is entitled to such affirmative relief as may be appropriate under the CTFMLA.

## COUNT SIX – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

137.    Plaintiff repeats and realleges paragraphs 1 through 92 of the Complaint as if fully set forth herein.

138.    By the above acts, including but not limited to, demanding that Plaintiff work early in the morning despite her need to manage and cope with her Long COVID symptoms and punishing Plaintiff if she inevitably experienced a medical emergency during her shift, Defendant intended to inflict emotional distress upon Plaintiff.

139.    Defendant purposefully took steps to make Plaintiff miserable in the workplace and created conditions that exacerbated her MS, causing her to suffer far more severe symptoms, and required countless doctors' appointments in an effort to address her worsening condition.

140.    Defendant knew or should have known that its conduct would cause Plaintiff emotional distress.

141.    The emotional distress inflicted upon Plaintiff was extreme and outrageous.

142.    As a result of Defendant's actions, Plaintiff suffered, and continues to suffer, severe emotional distress and aggravation of her disability.

## COUNT SEVEN – NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

143.    Plaintiff repeats and realleges paragraphs 1 through 92 of the Complaint as if fully set forth herein.

144.    Defendant knew, or in the exercise of reasonable care, should have known, that its conduct toward Plaintiff involved an unreasonable risk of causing emotional distress and that the distress was severe enough that, if it was caused, might result in illness or bodily harm.

145.    As a result of Defendant's conduct, Plaintiff suffered, and continues to suffer, severe emotional distress and aggravation of her disability.

**WHEREFORE**, the Plaintiff claims:

A.    Economic damages in the form of lost back pay, front pay, lost benefits, and other pecuniary losses, together with interest as permitted by law;

B.    Compensatory damages, including, but not limited to, damages for emotional pain, suffering, inconvenience, mental anguish, and the loss of enjoyment of life;

C.    Liquidated damages pursuant to 29 U.S.C. § 2617(a)(1)(A);

D.    Punitive damages, pursuant to common law, 42 U.S.C. § 1981a, and Conn. Gen. Stat. § 46a-104;

E.    Attorneys' fees and costs pursuant to 29 U.S.C. § 2617(a)(3); 42 U.S.C. § 2000e-5, Conn. Gen. Stat. § 46a-104;

F.    Other affirmative relief if necessary to eradicate the effect of Defendant's unlawful employment practices; and

G.    Any other relief that the Court deems reasonable and just.

23

## <u>DEMAND FOR JURY TRIAL</u>

 Plaintiff hereby demands a jury trial on all causes of action and claims with respect to which she has a right to jury trial.


**PLAINTIFF**
**STEPHANIE WHITE**

By: _/s/ Erica O. Nolan_____
 David A. Slossberg (ct13116)
 Erica O. Nolan (ct31097)
 HURWITZ SAGARIN SLOSSBERG &
 KNUFF LLC
 135 Broad Street
 Milford, CT 06460
 Tel: (203) 877-8000
 DSlossberg@hssklaw.com
 ENolan@hssklaw.com

## <u>CERTIFICATION</u>

I hereby certify that, as required by General Statutes § 46a-103, a copy of the Complaint was sent to the Connecticut Commission on Human Rights and Opportunities by emailing a copy addressed to ROJ@ct.gov.

*/s/ Erica O. Nolan*_____
Erica O. Nolan
